Filed 9/18/15  P. v. Griffin CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071140 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F03096) |
| v. | |
| SYLVESTER GRIFFIN, | |
| Defendant and Appellant. | |

A jury found that defendant Sylvester Griffin, a former medical transport driver, raped and murdered Alice Murphy, a 64-year-old resident of a Folsom housing complex where defendant had provided medical transport for the victim's neighbor.  Faced with undisputed DNA evidence of his semen at the crime scene, defendant testified he had consensual sex with the victim but did not commit the crimes.  The jury found defendant guilty of first-degree murder committed during rape and burglary, with personal use of a deadly weapon, a pillow and/or pillowcase.  (Pen. Code, §§ 187, 190.2, subd. (a)(17),

1

12022, subd. (b)(1); undesignated statutory references are to the Penal Code.) The jury also found defendant guilty on separate counts of rape and first-degree burglary (§§ 261, subd. (a)(2), 459), but acquitted him on a robbery count.

On appeal, defendant makes multiple attacks on *some* DNA evidence (partial profiles from low-level mixed samples) but fails to show prejudice in light of *unchallenged* DNA evidence of his sperm at the crime scene. Defendant also claims instructional error and complains of a midtrial recess of 18 calendar days (eight court days). We affirm the judgment.

FACTS AND PROCEEDINGS

The victim and her cat lived in the Mercy Senior Housing Complex in Folsom. She had a habit of leaving her front door unlocked and sometimes ajar, even at night, so the cat could come and go. At the time of her death a few days before Christmas 2009, the victim was still recovering from a neck injury for which she wore a cervical collar.

In 2009, defendant worked as a driver for Rapid Response medical transport company. One of his clients was the victim's neighbor, Constance Blassingame, who lived two doors away from the victim. Twice a week defendant arrived around 5:00 a.m., parked, and walked past the victim's apartment to Ms. Blassingame's door. This service ended in early November 2009.

On Saturday, December 19, 2009, the victim spent the day with her friend, Tamara O'Reilly. O'Reilly recalled dropping the victim home around 9:00 p.m. and later receiving a message that the victim had called, but no one answered the phone when O'Reilly called back Sunday morning around 11:00 a.m. A police detective testified O'Reilly told him she tried to call the victim Saturday night but no one answered. The victim's computer was turned on at 8:09 p.m. and off at 10:50 p.m. on Saturday.

On Monday, December 21, 2009, at about 11:50 a.m., O'Reilly arrived at the victim's home for a planned visit. The door was wide open. A couple of newspapers

2

were on the front porch.  The victim's body was on her bed with a pillowcase spread over her face.  She was pronounced dead at the scene.  Her purse was missing and was not recovered.  Police pursued a lead that a transient had been seen with a purse but were able to exclude that person.

DNA analysis of semen at the crime scene yielded a cold hit on a DNA database, pointing to defendant.  In the trial court and on appeal, defendant does not dispute that DNA evidence of his semen was at the crime scene.

The cause of death was homicidal asphyxia, atypical because the neck and hyoid bone were not fractured.  The coroner opined there was neck compression as a result of pressure combined with the cervical collar against her neck, as well as possible smothering, covering the nose and mouth.  The victim had bruises and abrasions to her face and pinpoint hemorrhages consistent with asphyxiation.  She had two fractured ribs and bruising to her chest, abdomen, vagina, arms, and legs.  Bruises on the inside of her thighs were consistent with sexual assault.  The coroner resisted defense counsel's attempts to elicit an opinion that the state of the sperm indicated the sex occurred three to five days earlier.  She could not say when the sex occurred.

As to the time of death, the coroner, who saw the body at the scene on Tuesday, December 22nd, at 2:00 a.m., opined the victim "had died very recently, meaning, within the past 24 hours.  It could have been longer.  It could have been shorter, but based on the observations of the lividity and rigidity, that seemed relatively reasonable."  The coroner clarified, "It could have been more than 24 hours.  It could have been 36 hours."  This would put the time of death as early as 2:00 p.m. Sunday, December 20, 2009.

Employment records show defendant worked Saturday, December 19, 2009, with his first pick-up at 4:40 a.m. and his last assignment at 5:12 p.m.  He did not work Sunday, December 20th.  He worked Monday, December 21st, with his first pick-up at 6:10 a.m. and his last at 4:13 p.m.  Defendant's supervisor, who also rented defendant a room in her home, testified defendant phoned her on Saturday, December 19th and said

3

he would not be home that night because he was going to Stockton to see his cousin, whose house had been robbed. He did not come home Sunday, and she did not see him again until Monday, December 21st, at work.

Police canvassed the victim's neighbors. Neighbor Steven Scribner, whose DNA was not found at the crime scene, said he and the victim planned to watch a football game on Sunday, December 20th, but no one answered when he knocked on her door, which was closed tight. He later phoned but no one answered. The timing was uncertain. Scribner told police he knocked and phoned Sunday around 1:30 p.m. Scribner was unavailable as a witness, but the jury saw his "Skyped" conditional examination taken a year after the murder, in which he said he phoned around 11:30 a.m. and went to her door around a half hour later and again about a half hour later.

Ms. Blassingame testified that when she left for an appointment that Monday morning, the victim's door was closed, as it had been for several days, and when Blassingame returned home around 10:00 or 10:30 a.m., the victim's door was closed and "It was swarming with police." Or perhaps she saw the police when she later went out again.

After the DNA analysis of semen at the crime scene indicated a match with defendant's DNA profile, the police located him in his home state of South Carolina, where he had moved about a month after the murder, ostensibly to care for sick parents. Police tape-recorded a phone conversation, played for the jury, in which defendant denied knowing the victim but agreed to look at a photograph. After receiving the emailed photo, defendant phoned police and left a message that he did not recognize the victim.

After his arrest, defendant told police in a tape-recorded interview, played for the jury, that the victim was probably a neighbor lady who once asked for help corralling her cat as defendant waited for his transport client. He helped the lady get the cat. She invited him into her kitchen and gave him juice. He was there about five or 10 minutes

4

and never entered the bedroom. When told there was evidence he was in the bedroom, he said he did not recall being in the bedroom, and he denied having sex with the victim.

In the trial court, defendant objected to some, but not all, of the DNA evidence, without specification by item. Defendant did *not* object to some of the DNA evidence that his sperm was found at the crime scene, and on appeal he says he does not dispute that his DNA was on the victim's underwear, towel, and bed sheet.

In the trial court, defendant *did* object to *other* DNA evidence (partial profiles or low-level minor-donor profiles from low-level mixed samples). At an Evidence Code section 402 hearing, the prosecution's DNA expert Michelle Chao testified to analysis of (1) sperm fractions in biologic evidence and (2) nonsperm mixed samples from more than one source, e.g., sweat, saliva, nose mucous and vaginal secretions. The trial court ruled the DNA evidence admissible.

Chao testified to the jury that she performed DNA testing on swabs from the victim's body, pillow case, bed sheets, towels, underpants, and carpet. Chao was able to obtain full DNA profiles in some samples from the victim's left breast, inner thigh, underwear, sheet, and towel. They were the same as defendant's DNA profile, estimated to occur at random among unrelated individuals in approximately one in multiple quadrillions or sextillions (depending on the particular item tested) of the African American population which includes defendant, one in 680 sextillion of the Caucasian population and one in 32 septillion of the Hispanic population.

Partial profiles of the sperm and nonsperm fractions of other samples, including those taken from the victim's body, were consistent with defendant's DNA profile.

"Foreign" DNA material not belonging to the victim or defendant was detected in some samples from the vaginal and thigh swabs and cuttings from the towel and bed sheet. Testing of five samples, all of which had a full profile on the sperm fraction, indicated a foreign allele at one locus (a number 16 allele on the eighth chromosome) that was not consistent with the victim's profile. Chao determined it could be a minor

5

contributor who has a 16 allele or it could be a product of, or inherent to the sperm fraction, meaning it could be "elevated stutter" -- which occurs when an allele breaks apart during testing and is detected as a separate, smaller allele -- that didn't get filtered out.

Scrapings from under the victim's fingernails revealed only the victim's DNA, except for one scraping with an extra allele that was not consistent with defendant's profile. Clippings of the victim's fingernails revealed only the victim's DNA.

One spot of blood on the carpet contained the victim's DNA profile, plus an additional allele not consistent with defendant's profile. Chao said it could have been deposited by anyone walking barefoot on the carpet at any time.

Defendant testified at trial. He was 41 years old at the time of the charged crimes. He admitted he abused drugs over the years and had prior convictions for grand theft in 1994, possession of cocaine with intent to distribute in 1995, and bank robbery in 1997. As he waited for Ms. Blassingame one day, the victim approached and asked for his help in retrieving her cat. He helped. She invited him in, wanted him to stay, and invited him to come back sometime. Yet they never exchanged phone numbers. He returned three times, because he was lonely and unable to reconcile with his wife. The first time, the victim said to come back after dark to avoid being seen by the neighbors. The second time, they drank alcohol, talked, and had sex. The third and last time was Saturday, December 19, 2009, around 9:00 or 10:00 p.m. They talked about their children and then had sex in the victim's bedroom. Defendant testified he left the victim, alive and well, around midnight or 1:00 a.m. Sunday morning, went home, and stayed there all day Sunday watching football on television. He sometimes rented a motel room to get away from the noisy children in the house where he rented a room. So as not to hurt the mother's feelings, he told her he was going to Stockton one day in early December, but that was just an excuse for spending the night at a motel.

6

Defendant claimed he was unaware of the victim's killing when he left California a month later, to be closer to his ailing parents in South Carolina. He heard on the news of the murder at the housing complex but did not think the women he had sex with could have been murdered. He recognized her in the emailed photo but lied because he did not think he could help the investigation. He withheld the fact he had sex with her because they had promised to keep their relationship "discreet."

Defendant testified he had nothing to do with the charged crimes.

Defendant's mother, his wife, his ex-wife, and his friend testified to their opinion that defendant is not violent or angry towards women, despite his drug use.

Defense witness Zena Dougherty, who lived in the housing complex, testified she brought a can of cat food to the victim's door on Sunday around 12:30 or 1:00 p.m., and knocked. The door opened a few inches; a hand reached out and took the can; and the door closed. Dougherty did not recall telling police that the victim came outside and talked with her. Dougherty has had memory problems since she fell after speaking with the police.

Prosecution rebuttal witness, Police Detective Jonathan Lasater, testified Dougherty told him on Tuesday, December 22, 2009, that she brought a can of cat food to the victim around noon on Monday, December 21st, and they spoke on the doorstep for 10 to 15 minutes. When the detective reminded Dougherty that the victim was already dead by then, Dougherty said it must have been Sunday but that did not make sense either, because she feeds her cat much earlier on Sundays before she leaves for church.

The jury found defendant guilty of murder committed during rape and burglary, with personal use of a deadly weapon, pillow or pillowcase, but found him not guilty of robbery.

The trial court sentenced defendant to life without possibility of parole for the murder committed during rape and burglary, plus one year for the personal use of a

deadly weapon. The court stayed sentence on the rape and burglary counts under section 654.

DISCUSSION

I

*DNA Evidence*

The bulk of defendant's appellate briefing is devoted to multiple attacks on some of the DNA evidence admitted at trial. He first argues the trial court erred in refusing to conduct a hearing under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) on the question whether there is a generally-accepted scientific protocol for interpreting low-level DNA mixtures containing partial DNA profiles, after the defense presented new evidence questioning the continuing reliability of DNA testing of "mixed sample[s]," where two or more contributors are present. Second, defendant argues the trial court erred in allowing evidence that a minor donor partial profile found in several nonsperm mixed samples was "consistent with" defendant's genetic profile from the sperm samples, where the nature of the partial profiles precluded any statistical analysis. Third, defendant argues the trial court should have excluded evidence of minor-donor partial-profiles in low-level samples because there was no affirmative showing the analyst complied with scientifically-accepted protocols in connection with comparison to known profiles, use of composite profiles, and lack of laboratory guidelines regarding low-level mixture interpretation.

We consider it unnecessary to address the merits of these arguments, because defendant concedes that some of the DNA evidence of his sperm at the crime scene was properly admitted, and he fails to show any possible prejudice from the additional DNA evidence.

Thus, assuming purely for the sake of argument that the trial court should have excluded the evidence, erroneous admission of the DNA evidence requires reversal only if it is reasonably probable the verdict would have been more favorable to defendant in

8

the absence of the challenged evidence. (*People v. Venegas* (1998) 18 Cal.4th 47, 93.) Defendant urges, unconvincingly, that federal constitutional error triggering a more favorable standard of prejudice for him. However, the ordinary rules of evidence generally do not impermissibly infringe on a defendant's constitutional rights. (*People v. Kraft* (2000) 23 Cal.4th 978, 1035-1036.) Defendant offers no reason to depart from the general rule and instead says admission of the challenged DNA evidence was prejudicial under any standard.

*People v. Capistrano* (2014) 59 Cal.4th 830, held that any error in allowing a DNA expert to testify regarding one test she did not personally administer was harmless, where she also testified about the results of another DNA test which she *did* personally perform. (*Id.* at pp. 870-873.) In that case, there was also other evidence rendering any error harmless, e.g., the victim identified defendant's co-perpetrators and another witness saw defendant with property matching the property stolen from the victim. (*Ibid.*) We recognize that *Capistrano* was a capital case with a stricter standard of prejudice, and the DNA evidence there, showing DNA "consistent with" the defendant's profile, was less probative than the challenged DNA evidence admitted in this case. (*Ibid.*)

*People v. Jones* (2013) 57 Cal.4th 899, held that, even assuming the prosecution failed adequately to prove general acceptance by the scientific community regarding a "dot intensity" technique for DNA analysis, any error in admitting the evidence was harmless under any standard in light of the DNA expert's rebuttal testimony about his own re-evaluation of the sample using a different, unchallenged technique. (*Id.* at pp. 935-940.)

Here, defendant claims the challenged DNA evidence was the "only" evidence supporting the state's case. Not so. The unchallenged DNA evidence supported the state's case. That defendant claimed consensual sex did not strip the unchallenged DNA evidence of its value in proving defendant was the perpetrator of the charged crimes.

9

Under the heading arguing that inability to calculate statistical probabilities rendered some of the DNA evidence inadmissible, defendant argues he was prejudiced because admission of the evidence complicated the defense by requiring defense counsel to make an extremely technical argument as to why the evidence was unreliable. Although it does not appear defendant sought to exclude the evidence on the grounds of time consumption or juror confusion, the trial court in ruling the DNA evidence admissible stated it had weighed probative value against prejudicial effect under Evidence Code section 352. However, the utility of defendant's partial attack on DNA evidence at trial eludes us, unless perhaps the defense hoped to confuse the jury. In any event, we see no prejudice from defendant responding to the challenged evidence. The DNA expert's entire testimony consumed only one day plus one hour of trial time, not an inordinate amount of time for DNA evidence.

In his opening brief, defendant concludes his prejudice argument by saying "the DNA evidence discussed here -- including (1) the statistics for the sperm fraction profile from the vaginal swab[,] (2) any remaining profiles found on the vaginal swab and (3) the non-sperm evidence -- should not have been admitted in this case. In connection with the non-sperm DNA evidence and for the reasons discussed [regarding absence of statistics], the admission of the improper evidence cannot be found harmless. And the prejudice was exacerbated here by the improper admission of the DNA profiles interpreted from the vaginal swab and the highly incriminating statistics attributed to that evidence. In light of the conceded presence of DNA evidence which did *not* match either [defendant] or [the victim], the improper admission of substantial DNA evidence cannot be found harmless under any standard. Reversal is required." (Orig. italics.) Defendant's reply brief says that, although the unchallenged evidence derived from defendant's semen was consistent with the defense theory that he had consensual sex with the victim a day or a day-and-a-half before her death, the defense theory "became substantially more complicated in the face of the additional DNA evidence for which no statistics was

10

offered.  Thus, counsel had to explain that the expert's opinion that the evidence was 'consistent with' [defendant's] profile required ignoring *additional* DNA left by the actual perpetrator. . . .  Of course, had the statistical analysis been performed, the jury could have been told the degree to which such evidence was consistent with [defendant] *as compared* to an unknown third party."  (Orig. italics.)

However, testimony about the challenged evidence being consistent with defendant did not require ignoring the evidence of a "foreign [donor]."  Moreover, defendant oversells the value of the "foreign [donor]" evidence.   Much of it was possibly explained as "elevated stutter."  Moreover, its presence was minimal and, as the prosecutor argued to the jury, traces of foreign DNA are to be expected in nonsanitized environments and, had the killer been someone other than defendant, much more foreign donor DNA should have been present at the crime scene, despite defendant's theory that this phantom wore gloves.

Defendant's reply brief claims the challenged DNA evidence was critical to the prosecution's case because the prosecutor argued to the jury that the sheer volume of the samples proved her case.  However, what defendant cites is the prosecutor's rebuttal to defense counsel's suggestion that the prosecution had to prove the absence of foreign DNA.  The prosecutor told the jury that traces of foreign DNA are to be expected in a nonsanitized environment, and the tiny trace alleles on the small number of items in this case was inconsequential, given "all the profiles that you saw on this visualizer and all the items and all the cuttings and all the swabs. . . ."  Thus, the prosecutor's point was that, if the killer were someone other than defendant, that person would have left much more DNA than the few samples found.

In his reply brief, defendant argues "the question is whether, absent the improperly admitted DNA evidence, a single juror could reasonably find that the sperm sample evidence -- which was explained by the defense -- proved beyond a reasonable doubt that [defendant] committed the crime, especially in light of DNA evidence found which

11

according to the state's own expert was inconsistent with [defendant]." However, defendant cites no authority that we should disregard the unchallenged DNA evidence in assessing the prejudicial effect of challenged evidence. That defendant admitted having sex with the victim does not render unduly prejudicial the additional DNA evidence of defendant's presence at the crime scene.

We conclude defendant fails to show prejudicial error warranting reversal based on the DNA evidence.

II

*Recess*

Defendant argues a recess of the trial for 18 calendar days (eight court days), after the prosecution presented some of its witnesses, violated his state and federal constitutional rights to due process and section 1050's requirement that there be good cause for continuances. We conclude the contention is forfeited because defendant apparently agreed to a recess of six court days, and he failed to object to the addition of two court days.

A.     Background

Defendant expects us to assume it was the prosecutor who wanted the recess, but the record does not disclose who proposed the recess or why. Instead, the record indicates everyone agreed to the majority of it (six court days) before jury selection. The trial court stated on the record on February 29, 2012, that the court and counsel had worked out the schedule in chambers, and the tentative schedule was for jury selection to commence March 13th, opening statements on March 19th, "and there is a short time period that we will be dark. That's the last two [court] days of March [Wednesday March 28th and Thursday March 29th, with no trial on Fridays] and the first week of April[.]" Before opening statements, the court on March 14th informed the jurors of this anticipated schedule.

12

At the end of the day on Thursday, March 22nd, after the prosecution presented the testimony of defendant's former supervisor and housemate, the court informed the jury: "[W]e have moved through the witnesses that we -- some of the witnesses that we thought might be coming in early next week. [¶] So we have had somewhat of a change. So the calendar you have, you can cross off next Monday and Tuesday [March 26 and 27]. So you're not coming back on the 26th and the 27th. Mark that through on the calendar that you received. [¶] You're going to be coming back on April 9th. So that's the Monday right after Easter, at 9 o'clock[.]"

Outside the jury's presence, the court noted that, pursuant to an informal agreement, it would meet with counsel on Monday March 26th to go over the jury instructions.

Defendant did not object to the recess.

When trial resumed on Monday, April 9th, the prosecution called as its next witness, the DNA analyst Michelle Chao. She testified for the full day plus an hour on the following day. The prosecution called a final, brief witness from the crime lab. The defense presented its entire case on Wednesday, April 11th, and the prosecution called a rebuttal witness that day. The jury heard closing arguments on Monday, April 16, 2012.

B.      Forfeiture

Defendant cannot complain on appeal about the recess, because he apparently agreed to the recess of six court days (or at least did not state any objection on the record) and did not object when two more court days were added. The contention is thus forfeited. (*People v. Ochoa* (2001) 26 Cal.4th 398, 440-441 [forfeiture of constitutional claim because failed to object to recess of nine calendar days, including five court days, during trial], abrogated on another point as stated in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14; *People v. Johnson* (1993) 19 Cal.App.4th 778, 791 [defendant failed to object to planned holiday recess of 17 days, including nine court days, during

13

deliberations].)  As a general rule, failure to object to errors in the trial court, including claimed violations of statutes and fundamental constitutional rights, relieves the reviewing court of the obligation to consider those errors on appeal.  (*People v. Romero* (2008) 44 Cal.4th 386, 411.)  The reason for the rule is to allow errors to be corrected by the trial court and to prevent gamesmanship by the defense.  (*Ibid.*)

Seeking to avoid forfeiture, defendant argues on appeal that the right to a jury trial "without interruption or delay at a critical juncture" is a fundamental component of the federal and state constitutional right to jury trial, requiring a personal waiver by the defendant.  However, waiver of jury trial is not at issue here, where defendant got his jury trial.  His appellate claim is of a due process violation.

Defendant says *People v. Aguilar* (1984) 35 Cal.3d 785, 794, noted that when an error affects the framework of a trial rather than merely the evidence presented, conduct by counsel will not constitute a valid waiver of a fundamental constitutional right. Defendant then summarily states, as if it were fact, his opinion that the asserted error here impacted the entire framework within which the jury evaluated the evidence.  We are not persuaded.  *Aguilar* involved a very different issue, i.e., waiver of a non-English-speaking defendant's state constitutional right to an interpreter throughout the court proceedings.

Defendant also argues that some "fundamental" protections cannot be waived without the client's concurrence, and in determining whether a particular principle is "fundamental" the courts look to "historical practice" and whether the practice has a "lengthy common-law tradition."  Defendant says the right to an uninterrupted jury trial has a long common-law tradition.  He cites authority of a common law tradition that, once evidence has been given, the jury cannot be discharged until they give their verdict, except in cases of necessity.  Here, however, the jury was not discharged.

We conclude defendant forfeited any challenge to the recess.

14

III

*CALCRIM No. 359 - Corpus Delecti*

Defendant maintains that, because identity was the central issue in the case, the jury instruction on corpus delecti (CALCRIM No. 359) -- which prohibits reliance on a defendant's inculpatory out-of-court statements alone as proof that a crime occurred, but allows such reliance to prove identity as the perpetrator -- impermissibly lowered the prosecution's burden to prove identity beyond a reasonable doubt.  Although defendant did not make any inculpatory out-of-court statements, he argues the jury may have found inculpatory his initial lies to police about not knowing the victim.  Assuming for the sake of argument that the issue is preserved for appeal despite defendant's failure to object to the instruction in the trial court, we see no grounds for reversal.

The trial court instructed the jury pursuant to CALCRIM No. 359:

"The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed.

"That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

 "*The identity of the person who committed the crime and the degree of the crime may be proved by the defendant's statement alone*.  [Italics added.]

"You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

In reviewing the contention that the instruction lowered the standard of proof, the question is whether there was a reasonable likelihood the jury misapplied the instruction. (*Victor v. Nebraska* (1994) 511 U.S. 1, 6 [127 L.Ed.2d 583]; *People v. Williams* (2013) 56 Cal.4th 630, 688-689.)  The challenged instruction is not viewed in isolation but is

15

considered in the context of the instructions as a whole. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385]; *People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

CALCRIM No. 359 sets forth the corpus delecti rule which essentially precludes conviction based solely on a defendant's out-of-court statements. (*People v. Ledesma* (2006) 39 Cal.4th 641, 721 (*Ledesma*).) The rule requires the prosecution to prove that a crime actually happened, apart from the defendant's out-of-court statements. (*Ibid.*) The evidence of a crime may be slight and need not point to the defendant as the perpetrator. (*Ibid.*) The corpus delecti rule does not require independent proof that the defendant is the perpetrator. (*Ibid.*) The principal purpose of the corpus delecti rule is to ensure that a defendant is not convicted of a crime that never occurred. (*Ibid.*) That purpose is fulfilled by the admission of evidence sufficient to establish that a crime occurred. (*Ibid.*)

It is also well established that a defendant's inculpatory out-of-court statements *may*, however, be relied upon to establish his or her identity as the perpetrator of a crime. (*Ledesma, supra*, 39 Cal.4th at p. 721.) This is because the perpetrator's identity is not part of the corpus delecti. (*Ibid.*)

*People v. Foster* (2010) 50 Cal.4th 1301 (*Foster*), in approving CALJIC No. 2.72, the predecessor instruction to CALCRIM No. 359, noted it "did not state . . . that identity 'did not have to be proved.' " (*Id.* at p. 1345.) "Rather it instructed that elements of a crime must be proved by evidence independent of any admission made by the defendant outside of the trial, but that the perpetrator's identity, which is not an element, may be established by an admission. Contrary to defendant's assertion, the instruction's statement that '[s]uch identity . . . may be established by an admission' reflects a recognition that identity must be established." (*Ibid.*)

Here, the corpus delecti rule was clearly satisfied by the uncontroverted evidence that the victim was murdered, i.e., she was strangled to death and was bloody and bruised. The issue is identity.

16

While this appeal was pending, defendant's appellate counsel was able, in an unrelated case, to convince the Sixth Appellate District in *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), to hold that the corpus delecti instruction is deficient to the extent it suggests, through its reference to identity, that criminal defendants can be convicted based only on extrajudicial statements that they committed a crime. (*Id*. at pp. 1427-1431 [finding no constitutional violation or prejudicial state law warranting reversal].) The Second Appellate District disagreed with *Rivas*'s criticism of CALCRIM No. 359, in *People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258 (*Rosales*).)

*Rivas, supra*, 214 Cal.App.4th 1410, acknowledged the corpus delecti rule requires some evidence that a crime occurred, independent of the defendant's statements, but the identity of the person who committed the crime is not part of the corpus delecti. (*Id*. at p. 1428; see also, *Ledesma, supra*, 39 Cal.4th at p. 721.) " '[O]nce the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues.' [Citation.] Plainly, that would include identity where it is at issue. But the reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime--and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party. The instruction requires reconsideration." (*Rivas, supra*, 214 Cal.App.4th at p. 1429, fn. omitted.)

*Rivas* was not swayed by the California Supreme Court's endorsement of the validity of the predecessor instruction, CALJIC No. 2.72, in *Foster, supra*, 50 Cal.4th at p. 1345, because *Rivas* noted the predecessor instruction, unlike the current instruction, specifically stated identity was "not an element of the crime." (*Rivas, supra*, 214 Cal.App.4th at p. 1429, fn. 8.)

*Rivas* nevertheless found no constitutional violation or state law error warranting reversal. (*Id*. 214 Cal.App.4th at pp. 1429-1431.) The jury was told more than once that it could find the defendant guilty only if convinced beyond a reasonable doubt that he committed them. (*Id*. at p. 1429.) And CALCRIM No. 220 informed the jurors they must consider all the evidence and find the defendant not guilty unless the prosecution proved him guilty beyond a reasonable doubt. (*Id*. at p. 1430.) "Because other evidence strongly pointed to [the defendant's] guilt, the error in giving CALCRIM No. 359 did not so badly infect the entire trial that reversal is required." (*Ibid*., fn. omitted.) And there was no reasonable probability the outcome would have been more favorable to the defense absent the error. (*Ibid*.)

In response to the defense argument that CALCRIM No. 359 told the jury in effect that his extrajudicial statements alone could supply a sufficient quantum of evidence to convict him, *Rivas* said, "But that is just the point: at most, the jury may have understood that [the defendant's] inculpatory extrajudicial statements *could* justify convicting him-- 'identity . . . *may* be proved by the defendant's statements alone.' [Citation.] It is not likely that the jury relied significantly on his statements in reaching the verdicts." (*Rivas, supra*, 214 Cal.App.4th at p. 1430, orig. italics.) The appellate court recited the evidence of the defendant's statements and noted the other evidence against him was more important. (*Ibid*.)

*Rosales, supra*, 222 Cal.App.4th at pp. 1259-1261, disagreed with the *Rivas* court's criticism of CALCRIM No. 359. *Rosales* said CALCRIM No. 359 states "with greater precision and economy of language" than the predecessor instruction approved in *Foster*, that the identity of the person who committed the crime may be proved by the defendant's statements alone, which is a correct statement of the law, and remind the jury the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. (*Rosales, supra*, 222 Cal.App.4th at p. 1261.) *Rosales* further stated that, assuming error, it was harmless in that case involving robberies of a hotel clerk in

18

front of witnesses and surveillance cameras.  (*Id*. at pp. 1257, 1261.)  The defendant's only extrajudicial statement, made as hotel guests wrestled him to the ground, was that he would be killed if the gun was not returned to its owner.  There was overwhelming evidence the defendant was the man who committed the robberies, and he was positively identified by eyewitnesses to the robberies.  (*Ibid*.)

We question the *Rivas* court's criticism of CALCRIM No. 359.  But we need not take a stand on the matter because, even assuming error for the sake of argument, it was clearly harmless under any standard.

Defendant argues it is reasonably likely the jury understood the challenged instruction to mean the prosecution did not have to prove beyond a reasonable doubt that defendant was the perpetrator.  Defendant says his out-of-court statements did not admit guilt but at most showed he lied to the police about not knowing the victim.  Defendant says the instruction told the jury these statements could prove his identity as the assailant.  He points out the prosecutor in closing argument called defendant a liar, said defendant lied to the police more than 25 times, told the jury "you have his statement" and nothing indicated someone else raped and killed the victim.  In rebuttal, the prosecutor told the jury, "Ask yourself if that man right there has convinced you of an alibi, the liar that he is . . . [did] he really [have] an alibi?"  According to defendant, the "infirmity" of the instruction was not "cure[d]" by the instruction that the jurors could not convict defendant "unless the People have proved his guilt beyond a reasonable doubt," because the disputed instruction told them defendant's own statements were proof against him.

However, the prosecutor never argued to the jury that defendant's out-of-court statements alone sufficed to prove he was the perpetrator.

Moreover, the unchallenged DNA evidence against defendant is strong evidence of his guilt, despite his claim that he had consensual sex with the victim.  No evidence whatsoever supported his self-serving testimony about repeated consensual sexual contact with a woman who did not even give him her phone number.  In light of the

19

strong evidence against defendant, it is unlikely, improbable, and inconceivable that CALCRIM No. 359 misled the jury into finding defendant guilty of murder solely because he lied to police about knowing the victim.

Defendant cites *Francis v. Franklin* (1985) 471 U.S. 307 [85 L.Ed.2d 344], in support of his argument that the jurors could have interpreted the instruction as indicating his pretrial statement was a means by which the prosecution could prove his identity as the perpetrator beyond a reasonable doubt. However, *Francis v. Franklin* involved an instruction setting up a mandatory rebuttable presumption found to have created an unconstitutional burden-shifting presumption regarding intent. (*Id*. at p. 316.) Here, the challenged portion of the instruction involved a permissible finding, not a presumption, and it would be permissible to rely on extrajudicial admissions to prove identity once the corpus delecti has been established.

We conclude there was no instructional error regarding identity.

IV

*CALCRIM No. 207 -- Date of Murder Need Not Be Proven*

Defendant claims the trial court erred in instructing the jury with CALCRIM No. 207 -- that the state did not need to prove the exact date of the murder -- because it undercut defendant's alibi defense that the murder occurred Monday when defendant was at work. Defendant claims the asserted error violated his federal constitutional rights to effective assistance of counsel and to present a complete defense, by effectively preventing his trial counsel from responding to the prosecution's case. Assuming for the sake of argument the issue is not forfeited by failure to object to the instruction in the trial court, the contention lacks merit.

The information, as read to the jury, alleged all crimes occurred "on or about" December 21, 2009.

The trial court instructed the jury: "It is alleged that the crimes occurred on or about December 21, 2009. The People are not required to prove that the crimes took place exactly on that day but only that they happened reasonably close to that day."

The Instructional Duty for this instruction state the instruction "should not be given: (1) when the evidence demonstrates that the offense was committed at a specific time and place and the defendant has presented a defense of alibi or lack of opportunity; and (2) when two similar offenses are charged in separate counts." (Judicial Council of Cal., Crim. Jury Instructions (2012) Bench Notes to CALCRIM No. 207.)

Under section 955, "[t]he precise time at which the offense was committed need not be stated in the accusatory pleading . . . ." However, " 'if the defense is alibi . . . the exact time of commission becomes critically relevant to the maintenance of the defense. An instruction which deflects the jury's attention from temporal detail may unconstitutionally impede the defense.' (*People v. Barney* (1983) 143 Cal.App.3d 490, 497.)" (*People v. Richardson* (2008) 43 Cal.4th 959, 1027 (*Richardson*).) It is improper to give the instruction "when the prosecution's proof establishes the offense occurred on a particular day to the exclusion of other dates, and when the defense is alibi (or lack of opportunity) . . . ." (*People v. Jennings* (1991) 53 Cal.3d 334, 358-359.) When these conditions are *not* met, the trial court does not err in giving the instruction because the instruction does not "deflect the jury's attention from a crucial temporal element for which the defendant had an alibi." (*Richardson, supra*, 43 Cal.4th at p. 1028.)

*Richardson* held a trial court did not err in giving the instruction (former CALJIC No. 4.71, predecessor to CALCRIM No. 207) in a case involving sex offenses and murder of a child, where the prosecutor planned to argue the murder occurred either in the evening or the following morning; the prosecutor actually argued to the jury that the murder happened between 9:00 and 10:00 p.m.; and the defendant presented "only a partial alibi." (*Id*. 43 Cal.4th at p. 1027.) His partial alibi was based on evidence that he left a friend's home (near the victim's residence in the same small neighborhood) around

21

9:10 p.m. and got to his (defendant's) nearby home at 10:00 p.m., though other witnesses saw him around the neighborhood around 11:00 and 11:30 p.m. (*Id*. at pp. 1027, 972-973.) *Richardson* stated, "Given this state of the evidence -- where the prosecution could have argued that the murder occurred sometime between 9:00 p.m. and 11:30 p.m. of December 3, if not in the early morning of December 4, and the inability of the defense to have established a firm alibi for defendant during this timeframe, the trial court did not err in deciding to give the instruction. It did not deflect the jury's attention from a crucial temporal element for which the defendant had an alibi. The prosecution's subsequent election during argument of a specific time period -- from 9:00 to 10:00 p.m. -- did not render the instruction erroneous so much as irrelevant." (*Id*. at pp. 1027-1028.) Insofar as the instruction became irrelevant, there was no reasonable likelihood it was applied in a manner that resulted in a constitutional violation. (*Id*. at p. 1028.)

Here, defendant did not have even a partial alibi. He claims on appeal that the prosecution presented evidence that the victim died at about 2:00 a.m. on Monday, December 21, 2009, and defendant presented an alibi that he was at work that day from 6:10 a.m. until 4:13 p.m.

There are several problems with defendant's argument. First, the prosecution's evidence did *not* establish time of death at 2:00 a.m. Monday; rather, the coroner testified she could not specify the time of death, and it could have happened as early as 2:00 p.m. on Sunday. The prosecutor told the jury "[w]e will never know" exactly when it happened. Defendant could have gone there Sunday, or even Saturday, based on unsuccessful attempts by friends to contact the victim and the Sunday newspaper left on her porch, and stayed awhile before killing her and leaving. Second, even if the murder happened at 2:00 a.m. Monday, as defendant supposes, defendant's showing up for work in Sacramento at 6:10 a.m. Monday is not an alibi for a murder committed in Folsom at 2:00 a.m. Monday.

Defendant's claim of alibi depends on his insinuation that the killer must have left the victim's home around 10:00 Monday morning, because some neighbors thought they noticed the victim's door closed on Monday morning as late as 10:00 a.m., yet the door was wide open when the victim's body was discovered at 11:50 a.m. Monday. This evidence about the door going from closed to open midmorning Monday neither pinpoints occurrence of the crimes nor affords defendant an alibi defense so as to render improper the "on or about" jury instruction. Even assuming for the sake of argument that the victim's neighbors in the senior housing complex were accurate in their recollections, none of them actually went to the victim's door on Monday morning to enable them to know whether the door was completely closed in a way that would have prevented the victim's cat from opening it. The evidence established the cat's habit of opening the door. Defendant argues neither the cat nor wind could have pushed "wide open" the door in the sheltered alcove, but he offers no evidence about behavior of a cat whose mistress was murdered. Although we do not buy into defendant's assumption that the killer must have opened the door between 10:00 and noon on Monday, we nevertheless note defendant offered no independent evidence of his whereabouts during that two-hour time period. Although defendant's supervisor testified defendant's work log showed he started work at 6:10 a.m. Monday morning and worked all day, she also testified defendant himself was the person who filled out that log. Since his job took him on the road, his self-reported log is insufficient alibi for his whereabouts between 10:00 a.m. and 11:50 a.m. on Monday, so as to render erroneous the "on or about" jury instruction.

We conclude the instruction was proper and did not undercut any alibi defense.

DISPOSITION

The judgment is affirmed.

                                     <u>     HULL         </u>, J.

We concur:

<u>     NICHOLSON     </u>, Acting P. J.

<u>     MURRAY       </u>, J.